# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2021

(Argued: January 26, 2022    Decided: October 13, 2022)

Docket Nos. 20-3858, 20-4127

---

PETRÓLEOS DE VENEZUELA S.A., PDV HOLDING, INC., PDVSA PETRÓLEO
S.A.,

*Plaintiffs-Counter-Defendants-Appellants*,

–v.–

MUFG UNION BANK, N.A., GLAS AMERICAS LLC,

*Defendants-Counter-Claimants-Appellees.*

---

Before:    LEVAL, LOHIER, and ROBINSON, *Circuit Judges.*

---

Appeal from a judgment entered in the United States District Court
for the Southern District of New York (Failla, *J.*) declaring valid and
enforceable against Appellants instruments governing a debt issue—notes,
indenture, and pledge agreement.  The district court granted Appellees'
motion for summary judgment, holding the notes, pledge agreement, and
indenture valid and enforceable under New York law, and denied
Appellants' cross-motion, which argued the documents were void under the

law of Venezuela, the jurisdiction of the issuer of the notes, and that the court should decline to enforce the notes on the basis of the act-of-state doctrine. Because the choice-of-law determination may depend in this case on the act-of-state analysis, and existing New York law does not clearly settle choice-of-law issues in this dispute, we certify questions on the issue to the New York Court of Appeals.

DECISION RESERVED AND QUESTIONS CERTIFIED.

————————

MICHAEL J. GOTTLIEB, Willkie Farr & Gallagher LLP, Washington, D.C.; JAMES R. BLISS, Paul Hastings LLP, New York, N Y (Nicholas Reddick, Kyle A. Mathews, Kristin E. Bender, Willkie Farr & Gallagher LLP, Washington, D.C.; Jeffrey B. Korn, Willkie Farr & Gallagher LLP, New York, NY; Kurt W. Hansson, Paul Hastings LLP, New York, NY; Igor V. Timofeyev, Paul Hastings LLP, Washington, D.C., *on the brief*), *for Plaintiffs-Counter-Defendants-Appellants*.

WALTER RIEMAN, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY (William A. Clareman, Jonathan Hurwitz, Shane D. Avidan, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Roberto J. Gonzalez, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Christopher J. Clark, Matthew S. Salerno, Sean H. McMahon, Latham & Watkins LLP, New York, NY, *on the brief*), *for Defendants-Counter-Claimants-Appellees.*

DONALD B. VERRILLI, JR., Munger, Tolles & Olson LLP, Washington, D.C. (Elaine J. Goldenberg, Munger, Tolles & Olson LLP, Washington, D.C.; George M. Garvey, Munger, Tolles & Olson LLP,

Los Angeles, CA, *on the brief*), *for Amicus Curiae the Bolivarian Republic of Venezuela.*

Douglass Mitchell, Previn Warren, Jenner & Block LLP, Washington, D.C., *for Amici Curiae David Landau, Nelson Camilo Sanchez Leon, Mila Versteeg, Diego Zambrano.*

---

ROBINSON, *Circuit Judge*:

In 2016, Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"), announced a proposed bond swap through which noteholders could tender unsecured notes due in 2017 in exchange for new notes due in 2020 and secured by a controlling interest in CITGO Holding, Inc. CITGO is owned by PDVSA through a series of subsidiaries and is considered one of Venezuela's most important strategic assets abroad. At the time of the exchange, the regime of then-President Nicolás Maduro controlled PDVSA's Board of Directors.

Article 150 of the Venezuelan Constitution vests the country's National Assembly with the power to approve "national public interest contracts." Although the democratically elected National Assembly passed two separate resolutions in 2016 that purported to assert its constitutional authority over national public interest contracts—including explicitly rejecting the plan to pledge

control of CITGO—PDVSA nevertheless executed the bond swap and issued the CITGO-secured debt.

Following recognition of Venezuela's Interim President Juan Guaidó by the United States in early 2019, Guaidó appointed another Board of Directors, which was recognized in the United States as the legitimate Board (although it does not exercise any influence or control over PDVSA within Venezuela). In October 2019, that Board, in the name of the PDV Entities, caused

this suit to be brought in the Southern District of New York. The PDV Entities seek declarations that the entire bond transaction is void and unenforceable and preventing the creditors from executing on the CITGO collateral. Plaintiffs argue the bond transaction was a contract of national public interest under Venezuelan law and PDVSA lacked authority to execute it without approval of the National Assembly pursuant to Article 150. And they contend separately that the withholding of Article 150 approval and the National Assembly resolutions constituted sovereign acts that rendered the bond exchange void and were entitled to legal deference under the act-of-state doctrine.

This case raises important questions about the scope of an as-of-yet uninterpreted provision of the New York Uniform Commercial Code, and about potential common law exceptions to New York's general approach to enforcing

contractual choice-of-law elections.  Because the New York Court of Appeals has not addressed these issues and they are important to the State's choice-of-law regime and status as a commercial center, we CERTIFY questions to the New York Court of Appeals.

## BACKGROUND[1]

## I.      The Parties

The plaintiffs-appellants in this case are the issuer, guarantor, and pledgor of the secured notes due in 2020 (the "2020 Notes").

PDVSA is the issuer of the 2020 Notes.  PDVSA is Venezuela's state-owned oil company, and as required under Article 303 of the Venezuelan Constitution, is wholly owned by the Venezuelan government.  PDVSA is incorporated under Venezuelan law and is considered part of the government's "Decentralized Public Administration."

PDVSA Petróleo S.A. is the guarantor of the 2020 Notes. It is also incorporated in Venezuela and is a wholly owned subsidiary of PDVSA.

PDV Holding, Inc. is incorporated in Delaware and has its principal place of business in Texas.  It is wholly owned by PDVSA.  PDV Holding is the sole

---

[1] This account is drawn from the summary judgment record and is essentially undisputed.

owner of CITGO Holding, Inc., which in turn owns CITGO Petroleum Corporation. CITGO Holding and CITGO Petroleum are incorporated in Delaware and maintain their principal places of business in Texas. PDV Holding pledged 50.1% of its equity interest in CITGO Holding as security for the 2020 Notes.

We refer to these three entities—PDVSA, PDVSA Petróleo, and PDV Holding—collectively as "The PDV Entities."

The defendants-appellees to this action are MUFG Union Bank, N.A. and GLAS Americas LLC. MUFG Union Bank is a federally chartered national banking association with offices in New York City. It is the trustee for the 2020 Notes. GLAS Americas is a New York limited liability company. It is the collateral agent for the 2020 Notes. We refer to these two entities collectively as "The Creditors."

## II.    The Exchange Offer

In April 2007, PDVSA issued $3 billion of notes with the principal to come due in April 2017. In October 2010 and January 2011, PDVSA issued a combined $6.15 billion of notes with the principal to come due in November 2017. We refer to this debt in aggregate as the "2017 Notes."

Between 2007 and 2016, various rating agencies downgraded PDVSA's credit rating.  As of September 2016, the 2017 Notes had an outstanding principal balance of $7.1 billion.

In early September 2016, the PDVSA Board approved the transaction at the heart of this dispute: a bond exchange through which holders of the 2017 Notes could tender their 2017 Notes in exchange for new notes with principal due in 2020.  Unlike the 2017 Notes, which were unsecured, PDVSA offered the 2020 Notes secured by a pledge from PDV Holding of a 50.1% equity interest in CITGO Holding. We refer to this tender offer—and ultimately the closed transaction—as the "Exchange Offer."

PDVSA's Board approved the Exchange Offer on September 7, 2016, in accordance with the corporate formalities of the company's certificate of incorporation and by-laws, including approval by the company's sole shareholder, the Venezuelan government, on September 8, 2016.  The PDV Petróleo Board similarly approved the Exchange Offer on September 7th in accordance with applicable corporate formalities.  PDV Holding's Board approved the CITGO pledge the following week on September 15. PDVSA announced the Exchange Offer within the next few days and filed an offering circular with the U.S. Securities and Exchange Commission.

Ultimately, 2017 Noteholders representing 39 percent of the aggregate principal amount outstanding, $2,799,272,267, decided to participate in the deal and tender their 2017 Notes.  Depending in part on when they tendered, 2017 Noteholders received between $1,120 and $1,220 of 2020 Notes for every $1,000 of 2017 Notes exchanged. As noted above, the 2020 Notes were secured by PDV Holding's pledge of 50.1% of its equity in CITGO Holding.  The Exchange Offer closed, and PDVSA issued the 2020 Notes on October 28, 2016.  The relevant documents for the closed transaction, referred to collectively as the "Governing Documents," are the Indenture,[2] the 2020 Notes,[3] and the Pledge Agreement.[4]

Much of the activity around the transaction involved contacts in New York. For example, the PDV Entities engaged a New York-based financial advisor and an American law firm with New York partners to advise on the structure of the deal.  The financial advisor solicited participation in the Exchange Offer from at least ten 2017 Noteholders who were based in New York.  Signature pages were

---

[2] The Indenture was executed by (i) PDVSA, as issuer, (ii) PDVSA Petróleo, as guarantor, (iii) MUFG Union Bank, as trustee, (iv) GLAS Americas, as collateral agent, (v) Law Debenture Trust Company of New York, as registrar, transfer agent, and principal paying agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg paying agent.

[3] The 2020 Notes were issued in global form through a number of Global Notes registered in the name of Cede & Co. as nominee of the Depository Trust Company, which represent the total debt issued.  For simplicity, this opinion will refer generally to the "2020 Notes."

[4] The Pledge and Security Agreement dated October 28, 2016, was between PDV Holding, Inc. as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the collateral agent, and the trustee.

exchanged between the entities in New York in connection with the signing and closing of the Governing Documents. The 2020 Notes were deposited in New York with the Law Debenture Trust Company of New York. Finally, all the Governing Documents state that they shall be construed in accordance with the laws of the State of New York, and that all matters arising out of them will be governed by New York law.

## III.    Political Backdrop and Venezuelan Constitution

The Exchange Offer occurred in the context of intense political conflict and turmoil in Venezuela. In December 2015, political parties that opposed Maduro won an overwhelming majority of the seats in the Venezuelan National Assembly. This opposition coalition began to assert its prerogatives under the Venezuelan Constitution, including with respect to PDVSA.

Several provisions of the Venezuelan Constitution are relevant to this dispute. Article 303 mandates that the State "shall retain all shares of [PDVSA]." J. App'x at 87. Article 150 vests the National Assembly with power to approve contracts of "national public interest." The operative text of the provision reads:

> The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law.
>
> No municipal, state[,] or national public interest contract shall be executed with foreign States or official entities, or with companies not

domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

J. App'x at 86. Additionally, Article 187, Paragraph 9 vests the National Assembly with the power to authorize the executive branch to execute contracts of national interest. The operative text of that provision reads:

It is the role of the National Assembly to: . . . Authorize the National Executive to enter into contracts of national interest, in the cases established by law. Authorize contracts of municipal, state[,] and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela.

*Id.* The terms "contracts of national public interest" and "contracts of national interest" are not defined. *Id.*

In early May 2016, Maduro declared a "State of Exception and Economic Emergency" that claimed a number of powers for himself, including the right to unilaterally execute public interest contracts. J. App'x at 2612.

In response, in May 2016, the National Assembly passed a "Resolution on the Respect of the Inherent Non-transferable Powers of the National Assembly on Contracts of Public Interest Signed by and Between the National Executive and Foreign States or Official Entities or with Companies Not Domiciled in Venezuela" (the "May 2016 Resolution"). J. App'x at 3514–16. The May 2016 Resolution explicitly invoked the National Assembly's powers under Articles 150 and 187, and (1) rejected the provision of Maduro's emergency decree that purported "to

10

authorize the National Executive to sign contracts of public interest, without the approval of the National Assembly[;]" (2) "warn[ed] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void[;]" (3) "remind[ed] that . . . contracts of national . . . public interest . . . without the approval of the National Assembly . . . shall be null and void in their entirety"; and (4) instructed that the resolution be circulated to foreign embassies to inform them about the nullity of public interest contracts executed without legislative approval.  J. App'x at 3515–16.

Immediately after PDVSA announced the Exchange Offer on September 17, 2016, the National Assembly responded with a second resolution on September 27, 2016: the "Resolution[] on the Current Financial Situation of Petróleos de Venezuela S.A."  J. App'x at 110–12.  The resolution invoked the National Assembly's powers under Article 187, and resolved: (1) to summon the PDVSA President to appear before the National Assembly to explain the bond swap; (2) "[t]o reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation[;]" (3) "[t]o urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187,

section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela[;]" and (4) to urge PDVSA to present the Country with a refinancing plan. J. App'x at 111. As stated above, PDVSA and its subsidiaries executed the Exchange Offer, notwithstanding the National Assembly's two resolutions.

The conflict between the National Assembly and the Maduro regime continued to escalate from the fallout of the 2018 presidential election in which Maduro claimed victory for himself. The U.S. government described these elections as "not free, fair or credible." J. App'x at 4803. On January 15, 2019, the National Assembly issued a legislative order naming National Assembly President Juan Guaidó as the Interim President of Venezuela. The United States recognized Guaidó as the Interim President of Venezuela and the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people." J. App'x at 4803.

In February 2019, the National Assembly enacted the "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela." J. App'x at 4750. Pursuant to this transition statute, Interim President Guaidó appointed a new, *ad hoc* board of directors for PDVSA. This new PDVSA board appointed new boards for PDVSA Petróleo and PDV Holding.

In October 2019—just over three years after the Exchange Offer—the National Assembly passed a third resolution, titled "Resolution that Reiterates the Invalidity of PDVSA's 2020 Bonds" (the "October 2019 Resolution"). J. App'x at 118–20. After recounting the political struggle between the National Assembly and the Maduro regime over PDVSA and the Exchange Offer, the October 2019 Resolution purported to (1) "ratify that the 2020 Bond indenture violated Article 150 of the Constitution[;]" (2) "ratify that the 2020 Bond indenture violated Articles 311 and 312 of the Constitution[;]" (3) "reiterate all the questions that this National Assembly has been formulating since 2016 regarding the irresponsible indebtedness of PDVSA[;]" and (4) "summon the Government of [President Guaidó] to adopt all actions aimed at defending PDVSA's assets in the United States . . . ." J. App'x at 118–20.

Control of the PDV Entities became divided. The Maduro-appointed Board remained in control of all operations and assets in Venezuela. At the same time, after the United States government's recognition of Guaidó as the legitimate President of Venezuela, the Guaidó-appointed Ad Hoc Board was recognized in the United States as the governing body of the PDV Entities.

The 2020 Notes required principal payments each October, and interest payments each April and October. PDVSA (in Venezuela) made the scheduled

payments between 2017 and April 2019, and the Ad Hoc Board took the position that the payments were made subject to a reservation of rights as to the validity of the 2020 Notes.  PDVSA did not make its scheduled October 2019 principal and interest payments.  At this point, the Ad Hoc Board caused this suit to be brought in the United States in the name of the PDV Entities.  The Ad Hoc Board directs the PDV Entities in the conduct of this litigation.

## IV.    District Court Proceedings

The PDV Entities sued on October 29, 2019.  The complaint sought declarations that the 2020 Notes, Indenture, and Pledge Agreement are invalid, illegal, null and void *ab initio*, and thus unenforceable.  The PDV Entities also requested an injunction preventing the Creditors from enforcing any claimed remedy under the Notes.  The Creditors counterclaimed on December 18, 2019, asking for a declaratory judgment that the Governing Documents are enforceable and asserting claims for breach of contract, breach of warranty, unjust enrichment, and quantum meruit.

The case proceeded quickly through discovery and the parties filed cross-motions for summary judgment in June 2020.  In their motion, the PDV Entities asserted the 2020 Notes, Indenture, and Pledge were invalid for two reasons.  First, they argued that the National Assembly's withholding of Article 150 authorization

for the Exchange Offer, and its affirmative passage of resolutions rejecting the Exchange Offer, constituted sovereign acts that rendered the entire Exchange Offer void under Venezuelan law. Under the act-of-state doctrine, they argued, the district court was required to accept and give effect to those sovereign acts. Second, they argued New York choice-of-law principles directed the court to apply Venezuelan law on the issue of the validity of the 2020 Notes, and that the notes were void under Venezuelan law because the Exchange Offer is a contract of national public interest requiring Article 150 approval.

After the PDV Entities invoked the act-of-state doctrine, the district court invited the United States to submit its views about the applicability of the doctrine and U.S. policy. The United States filed a statement of interest, responding that it took no position on whether the act-of-state doctrine applied because, in its view, there were "unresolved questions of fact and of Venezuelan law antecedent to the possible applicability of the doctrine." J. App'x at 5234. It also took the position that resolving the case in accord with U.S. law and policy "appear[ed] to turn on questions of fact and of Venezuelan law." J. App'x at 5233. It further noted "the United States' foreign policy concerning Venezuela is being effectuated in part through [the Office of Foreign Asset Control]'s implementation of the U.S.

sanctions regime, without regard to the act of state or comity doctrines." J. App'x at 5234.

Following extensive oral argument, the district court issued its decision on October 16, 2020, ruling for the Creditors on both issues. The district court first rejected the PDV Entities' act-of-state argument. While concluding the National Assembly resolutions constituted official acts of a foreign sovereign, the court held that under this Court's decision in *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), the October 2019 Resolution could not retroactively extinguish the notes. The district court then examined the language of the May 2016 and September 2016 resolutions and concluded that by their plain text, they did not operate to void the Exchange Offer. In particular, the district court reasoned that on its face the May 2016 Resolution addressed the authority of the *National Executive* but did not apply to the PDV entities. It concluded that the September 2016 Resolution did not identify the Exchange Offer as a contract of national public interest and did not assert that the Exchange Offer, if executed without National Assembly approval, would violate Article 150 or otherwise be invalid or void. The court rejected the argument that the National Assembly's withholding of Article 150 approval qualified as the act of a foreign sovereign because it concluded that the Assembly's decision to withhold its approval

constituted a decision not to act rather than an official action, and therefore lacked the formality necessary to qualify as an official act under the doctrine.

Turning to choice of law, the district court held New York law governed the dispute in its entirety. The court rejected the PDV Entities' statutory argument that section 8-110(a)(1) of the New York Uniform Commercial Code required the court to apply Venezuelan law in assessing the validity of the Exchange Offer. After rejecting several choice-of-law theories regarding the authority of foreign entities and the enforceability of contracts that are illegal under foreign law, the district court concluded that New York law applied via a traditional center-of-gravity analysis. The court assumed for the purposes of its analysis that the New York choice-of-law clauses in the agreements were ineffective, explaining that either approach would result in application of New York law.

Finding no infirmity in the Governing Documents under New York law, the district court granted the Creditors' motion for summary judgment and denied the PDV Entities' cross-motion.[5] By judgment entered December 1, 2020, the court

---

[5] Because the district court applied New York law in assessing the validity of the Governing Documents, it did not resolve the contested question of whether the Exchange Offer constituted

declared the Governing Documents enforceable. It further declared the PDV Entities in default and the Creditors entitled to exercise their remedies for default, including sale of the collateral. The district court also entered a monetary judgment on the Creditors' breach-of-contract counterclaims.

The PDV Entities filed this appeal and moved to stay execution of the judgment during the pendency of the appeal. The district court granted the motion.

## DISCUSSION

The issues raised in this appeal largely track those raised in the district court. The PDV Entities argue the district court contravened the act-of-state doctrine by failing to give effect to the National Assembly resolutions by declaring the Governing Documents enforceable. Next, they challenge the district court's conclusion that the validity of the Governing Documents should be determined solely under New York law. They argue that New York Uniform Commercial Code section 8-110—or, in the alternative, several non-statutory choice-of-law

_____

a national public interest contract for purposes of Article 150. Also, because it awarded summary judgment to the Creditors on their breach of contract counterclaims, the district court denied summary judgment on their claims for unjust enrichment and quantum meruit, and excluded the PDV Entities' expert report relating to those equitable claims. The Creditors had not moved for summary judgment on their counterclaims for breach of warranty. This appeal addresses only the contract and declaratory judgment claims on which the district court based its judgment.

principles—direct the application of Venezuelan law on the issue of the validity of the 2020 Notes, particularly with respect to PDVSA's authority to execute the Exchange Offer without legislative approval.

## V. Standard of Review

We review without deference the district court's rulings on motions for summary judgment. *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010). Summary judgment is proper when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## VI. Act-of-State Doctrine

Because the act-of-state doctrine applies only when resolution of a claim or defense under applicable law requires adjudication of the validity of a foreign sovereign act, we conclude that resolution of the New York choice-of-law issues is a necessary antecedent to the potential application of the act-of-state doctrine in this case.

The act-of-state doctrine is a rule of decision requiring that, in the process of deciding cases, courts accept as valid the acts of foreign sovereigns taken within their own jurisdictions. *See W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990). While the rationale underlying the doctrine has varied

throughout history, the Supreme Court's more recent cases tie the doctrine to separation of powers principles and a concern that the Judicial Branch's "passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." *Id.* at 404 (internal quotation marks omitted).

We recently described the contours of the doctrine in *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133 (2d Cir. 2022). In *Celestin*, we concluded that the act-of-state doctrine did not preclude an antitrust claim for collusion to fix the prices of remittances and telephone calls between the U.S. and Haiti—allegedly facilitated by a Haitian Presidential Order and Central Bank Circulars—because the claims did not require adjudication of the *validity* of any Haitian sovereign acts. *Id.* at 145. After expounding on the doctrine and our recent cases dealing with it, *id.* at 138–40, we summarized the doctrine as follows:

> [W]hen applicable, the act of state doctrine serves as a rule of decision on the merits. First, the court should assume that a foreign state's official acts executed within that state's territory are valid in that they have the legal effects—like transfers of title, assumptions or repudiations of contractual obligations, and grants of public authority—that they purport to have. Second, under that premise, the court should evaluate the merits of the legal claim or defense before it according to the posture of the case.

*Id*. at 140. We explained that by "legal claim or defense before it" we meant that a court should evaluate "the claim or defense under the law of the relevant

jurisdiction. For example, a U.S. federal or state cause of action may not turn on a foreign act's validity, even if an analogous cause of action under foreign law would be precluded by the act." *Id.* at 140 n.4.

This final proviso disciplines our approach in this appeal. As noted above, the act-of-state doctrine does not alter our obligation to evaluate the parties' claims and defenses in this action under governing law. The PDV Entities contend that the absence of National Assembly approval, the 2016 resolutions,[6] or some combination thereof, were sovereign acts that had the legal effect under Venezuelan law of rendering the Governing Documents void from the beginning. But if the PDV Entities' contractual obligations (or lack thereof) do not turn on the status of the Exchange Offer *under Venezuelan law,* the act-of-state doctrine is not implicated. That is, if Venezuelan law is irrelevant to the PDV Entities' obligations under the Governing Documents because New York law applies in this proceeding, then the act-of-state doctrine would not apply.

---

[6] Our decision in *Allied Bank* forecloses any argument that the October 2019 Resolution could operate on its own to retroactively void the 2020 Notes, Indenture, and Pledge Agreement. We do not read the PDV Entities' brief as arguing otherwise, as their argument is focused on distinguishing *Allied Bank* as involving "retroactive repudiation of debt that was indisputably valid when issued." Appellants' Br. at 40. Because we are starting with the choice-of-law issue, we express no opinion on whether the October 2019 Resolution could have some interpretative or authoritative weight with respect to the meaning and impact of the 2016 resolutions.

This conclusion is consistent with guidance from the Restatement (Fourth) of Foreign Relations, which we cited favorably in *Celestin*. *See* 30 F.4th at 138. This Restatement commentary explains: "when applicable," the act-of-state doctrine "bars a court from questioning the validity of the foreign act on the ground that it did not comply with that sovereign's own legal requirements, international law, or U.S. law or policy." Restatement (Fourth) of Foreign Relations Law § 441 cmt. (a). Though the doctrine requires courts to accept the validity of a foreign sovereign act, it does not preclude courts from imposing extraterritorial legal consequences arising from that act in accordance with applicable law. *Id.* § 441 cmt. (d). For that reason, we do not understand the act-of-state doctrine to require a departure from ordinary choice-of-law analysis in determining the legal consequences in the United States of a foreign sovereign act.[7]

So, although the PDV Entities advance the act-of-state doctrine as the lead argument on appeal, we view the choice-of-law analysis as a necessary antecedent

_____

[7] The *Celestin* court described the act-of-state doctrine as a "special choice-of-law rule." 30 F.4th at 138. Consistent with the discussion above, we understand that description to refer to choice of law with respect to the validity of foreign sovereign acts—in this case the 2016 National Assembly resolutions and the absence of approval of the Exchange Offer—and not with respect to the extraterritorial *consequences* of the foreign sovereign acts under the substantive law applied in a particular case—in this case the impact, if any, on the enforceability of the Governing Documents.

to the act-of-state analysis in this case.  Accordingly, we reserve judgment on the act-of-state argument pending resolution of the choice-of-law issues.

## VII.    Choice of Law

At the heart of this dispute are complex and important questions involving New York choice-of-law principles. The PDV Entities contend that PDVSA lacked legal authority to execute the Exchange Offer without express approval from the National Assembly.  They assert the Exchange Offer was a "contract of national public interest" because it secured billions of dollars of PDVSA debt by posting as collateral the country's "crown jewel," CITGO.  Appellants' Br. at 3.  In the view of the PDV Entities, the 2020 Notes, Pledge Agreement, and Indenture (including their choice-of-law clauses) were all void from the jump because PDVSA possessed no ability, authority, or capacity to execute the Exchange Offer absent National Assembly approval.  Whether the PDV Entities can rely on the asserted requirements of Venezuelan law to challenge the *validity* of the bonds turns on New York choice-of-law rules.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity jurisdiction apply the choice-of-law rules of the state in which it sits).

The core facts are not disputed.  The parties executed Governing Documents that contain New York choice-of-law clauses.  Much of the activity surrounding

the Exchange Offer occurred in New York, and the notes themselves are located in New York.  But PDVSA is a Venezuelan corporation, created and empowered by Venezuelan law.  And it is not just any corporation, but a corporation anchored to state ownership by constitutional mandate.  Moreover, the Venezuelan Constitution requires the National Assembly to approve contracts of national public interest.

In light of these facts, the parties make several competing arguments regarding whether New York or Venezuelan law governs the validity of the 2020 Notes.  The PDV Entities rely heavily on the statutory choice-of-law directive for investment securities in New York Uniform Commercial Code section 8-110(a)(1), which says that the "local law of the issuer's jurisdiction . . . governs . . . the validity of a security[.]"  They also fall back on common law choice-of-law principles as articulated primarily by federal district courts within this Circuit, including the principle that a foreign entity's authority is determined under foreign law, and that under New York law a security issued by a foreign entity can be unenforceable on the ground that it was issued in violation of the law of the issuer's jurisdiction.  The Creditors contest these arguments and point instead to the Governing Documents' New York choice-of-law clauses and a traditional center-of-gravity

analysis, which they say require application of New York law to all issues, including whether the contracts are valid.

We consider the competing arguments concerning the applicability of section 8-110(a)(1), and of New York common law choice-of-law principles in turn.

A.     Uniform Commercial Code Section 8-110(a)(1)

The PDV Entities advance a textual argument that section 8-110(a)(1) of the New York Uniform Commercial Code requires application of Venezuelan law to the question of whether the Exchange Agreement is invalid because it was not approved by the National Assembly, and the Creditors draw on New York caselaw and other considerations to support a narrower view of section 8-110(a)(1).

Article Eight of New York's Uniform Commercial Code, which deals with investment securities, contains a choice-of-law directive that, if applicable, would require application of Venezuelan law to determine the validity of the bonds: "[t]he local law of the issuer's jurisdiction, as specified in subsection (d), governs: (1) the validity of a security[.]"  N.Y. U.C.C. § 8-110(a)(1).  Subsection (d) states that an "[i]ssuer's jurisdiction" is the jurisdiction under which the issuer is organized.

*Id*. § 8-110(d).  PDVSA is the issuer of the 2020 Notes[8] and is organized under the laws of Venezuela; Venezuelan law is the "local law of the issuer's jurisdiction." Accordingly, the statute appears to call for the application of Venezuelan law to determine the "validity" of the 2020 Notes.

The term "validity" is not defined in section 8-110, but the Official Comment to that section ties the meaning of "validity" to the provisions in  section 8-202. Specifically, the Official Comment to section 8-110 explains that subsection 8-110(a) "ensures that a single body of law will govern the questions addressed in Part 2 of Article 8, concerning the circumstances in which an issuer can and cannot assert invalidity as a defense against purchasers."  *Id*. § 8-110 cmt. 2.  The Official Comment also states: "whether an issuer can assert the defense of invalidity may implicate significant policies of the issuer's jurisdiction of incorporation. *See, e.g.*, Section 8-202 and Comments thereto."  *Id*.  The Official Comment, therefore, suggests that the meaning of "validity" is connected to various defenses of invalidity, which are detailed in Part 2—more specifically, section 8-202.  *See also* 7 Hawkland, et al., UCC Series § 8-110:2 (2020) ("[S]ection 8-202 is the principal

---

[8] Both parties appear to agree that the 2020 Notes fall within the definition of security under Article 8.

Article 8 substantive rule to look to for guidance in applying the choice of law rule in subsection 8-110(a).").

Section 8-202 expressly indicates that "validity" is determined with reference to, among other things, the issuer jurisdiction's constitution. Section 8-202(b)(1) states:

> [I]f an issuer asserts that a security is not *valid* . . . [a] security other than one issued by a government or governmental subdivision, agency, or instrumentality, even though issued with a defect going to its *validity*, is *valid* in the hands of a purchaser for value and without notice of the particular defect *unless the defect involves a violation of a constitutional provision*. In that case, the security is *valid* in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue.

(emphases added). Because section 8-110 and its Official Comment tie the concept of "validity" to defenses of invalidity under section 8-202, and because section 8-202 explicitly mentions constitutional violations as a type of defect that could bear on a security's invalidity,[9] the plain language of Article 8 and associated

---

[9] Section 8-202 and its Official Comment detail rules for when and against whom issuers may assert defenses of invalidity. As explained by the Official Comment, subsection (b) puts the onus on the issuer to make sure the security is free of defects, and generally gives purchasers for value without notice the right to enforce a defective security against the issuer. *See* N.Y. U.C.C. § 8-202 cmt. 3. But the Comment also details three circumstances where purchasers do not gain those rights, which include violations of constitutional provisions and some situations involving a governmental issuer. *Id.* We express no view about whether PDVSA falls into these exceptions, and only refer to section 8-202 insofar as it sheds light on the meaning of "validity" in section 8-110.

commentary support applying Venezuelan law to determine the validity of the 2020 Notes in light of Articles 150 and 187(9) of the Venezuelan Constitution.

The Creditors advocate a much narrower view of the scope of section 8-110(a) and the meaning of "validity," making arguments that point the other way. Citing the Bill Jacket for Section 8-110 and a Uniform Commercial Code Treatise, the Creditors argue that "validity" goes only to whether the security was issued in accordance with the issuer's corporate charter, by-laws, and the corporate law of the issuer's jurisdiction.  The Creditors deny that section 8-202(b)(1) illuminates the meaning of validity, and they suggest section 8-202(b)(1)'s reference to "violation[s] of . . . constitutional provision[s]" is cabined to those constitutional provisions directly dealing with the issuance of securities.[10]

Whatever its weaknesses as a textual matter,  at least two factors may support the Creditors' position that section 8-110 calls for application of Venezuelan law in determining the validity of the 2020 Notes: (1) two recent New

_____

[10] The treatise on which the Creditors rely suggests section 8-202 contemplates a scenario quite analogous to our case: where a governmental issuer sold municipal bonds to the public, only to later discover some "constitutional or statutory provision concerning authorization for issuance of municipal bonds had not been satisfied."  7 Hawkland, et al., UCC Series § 8-110:2. Here, we have a government-owned issuer arguing a key constitutional provision concerning authorization for public interest contracts has not been satisfied.

York Court of Appeals cases giving broad effect to choice-of-law clauses in New York; and (2) the absence of any caselaw on section 8-110.

First, a thread of New York caselaw could support the Creditors' argument that in light of the contractual provisions calling for application of New York law, section 8-110 has no bearing on this case. In *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 20 N.Y.3d 310 (2012), the New York Court of Appeals considered an action to recover on defaulted notes guaranteed by a Brazilian company. The guarantee was subject to New York choice-of-law provisions pursuant to General Obligations Law section 5-1401,[11] and the action to enforce it was brought by a purchaser of the notes. The Brazilian company argued that the guarantee was unenforceable because it was never approved by the company's board of directors, as required under Brazilian law. New York conflict-of-law principles, the company argued, required application of Brazilian substantive law to evaluate the enforceability of the agreement. The New York Court of Appeals disagreed.

---

[11] General Obligations Law section 5-1401(1) allows parties to choose New York law to govern contracts arising out of transactions covering not less than $250,000 even if they lack New York contacts. By its own terms section 5-1401 does not apply "to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code." Section 1-301(c) provides that if section 8-110 (among others) specifies the applicable law, the parties' contrary agreement as to the applicable law is effective "only to the extent permitted" by section 8-110. Accordingly, it appears that where the authority for a New York choice-of-law election relies on section 5-1401(1), that choice-of-law election cannot override section 8-110. We do not understand the choice-of-law election in this case to rest on the authority conferred by section 5-1401(1).

Relying heavily on the purposes underlying General Obligations Law section 5-1401, the court concluded that "[t]o find here that courts must engage in a conflict-of-laws analysis despite the parties' plainly expressed desire to apply New York law would frustrate the Legislature's purpose of encouraging a predictable contractual choice of New York commercial law and, crucially, of eliminating uncertainty regarding the governing law." 20 N.Y.3d at 316.[12]

In 2015, the Court of Appeals extended this holding to a case in which the applicable choice-of-law principles were embodied in a statute rather than

---

[12] The court did not give specific guidance as to whether and how to deploy New York law to assess the *actual* authority of the officers who signed the guarantee in question. The First Department had applied New York law in evaluating whether the agreement, "allegedly executed by a person lacking actual authority under foreign law, is enforceable by a third party." *IRB-Brazil Resseguros, S.A. v. Inepar Invs., S.A.*, 83 A.D.3d 573 (1st Dep't 2011). In applying New York law, however, the First Department relied on ratification in enforcing the guarantee, so it did not wrestle with the conundrum of how to evaluate a person's *actual* authority to undertake an action without considering the laws under which that person acted. This is the conundrum identified by the district court in this case. *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 283 n.12 (S.D.N.Y. 2020) ("[T]here is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears." (internal quotation marks omitted)).

In addition, we note that in *IRB-Brasil* no party had argued to the Court of Appeals that the choice of law provision was inapplicable to a dispute over contract formation; the dispute was whether the clause required application of New York choice of law rules, or the automatic application of New York substantive law. *Cf. Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)(observing, in dicta that "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established")(citing *Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) for the proposition that "we cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract").

common law, and in which the New York choice-of-law election did not rest on the authority of General Obligations Law section 5-1401. *See Ministers & Missionaries Benefit Board. v. Snow*, 26 N.Y.3d 466 (2015). In *Ministers*, the Court of Appeals held that New York choice-of-law provisions in retirement and death benefit plans for certain ministers and missionaries controlled over a New York statutory directive, EPTL 3-5.1(b)(2), that would have applied the substantive law of the decedent's domicile at death in determining the effect of the decedent's divorce on the designation of his wife as beneficiary. *Id.* at 476. The court reasoned that "[i]f New York's common-law conflict-of-laws principles should not apply when the parties have chosen New York law to govern their dispute . . . and EPTL 3-5.1(b)(2) simply represents a common-law conflicts principle that has been codified into statute, that provision should not be considered in resolving th[e] dispute." *Id.* at 474. A contrary view, the court reasoned, would undermine the contracting parties' expressed intent to avoid a conflict-of-laws analysis. *Id.* at 475. The Court of Appeals' conclusion in *Ministers* rested on its determination that EPTL 3-5.1(b)(2) was essentially a "conflict-of-laws directive" rather than a "statement of substantive law." *Id*. at 474.

We cannot confidently predict what the Court of Appeals would do in the present case. As set forth above, section 8-110 is not a freestanding choice-of-law

rule. It is closely related to and gives effect to the substantive law governing commercial contracts set forth in section 8-202, and is accordingly an integral part of a comprehensive statutory scheme of substantive law under New York's Uniform Commercial Code. Concluding that the parties' contractual choice-of-law election in this case overrides section 8-110, assuming for the sake of discussion that it otherwise applies, would potentially impact the parties' abilities to assert their substantive rights under the New York Uniform Commercial Code more broadly. Moreover, we find it potentially significant that the New York Uniform Commercial Code provision that recognizes the enforceability of choice-of-law elections when a transaction bears a reasonable relation to the selected jurisdiction expressly excepts circumstances where section 8-110 specifies the applicable law and provides that a choice-of-law election that runs counter to the requirements of section 8-110 is effective only to the extent permitted by that section. *See* N.Y. U.C.C. § 1-301. For these reasons, although the *IRB-Brasil/Ministers* line of cases gives the Creditors a potential counterargument, whether the parties' contractual choice-of-law election overrides any effect of section 8-110 is very much an open question.

A second factor causes us to approach the PDV Entities' section 8-110 argument with caution: the absence of any cases applying the statute. As far as

we can tell, the New York Court of Appeals has never interpreted section 8-110, much less applied it in a way that would provide guidance as to its scope. Considering the volume of securities activity in New York, if section 8-110 was as broad as the above analysis suggests, one would expect to find a trove of New York decisions applying the statute.

For these reasons, existing precedent does not allow us to predict with confidence the proper resolution of the PDV Entities' section 8-110 argument.

B.    Potential Common Law Exceptions to Enforcing Choice-of-Law Clauses

The general rule under New York law, as set forth above, is that "courts will generally enforce choice-of-law clauses and that contracts should be interpreted so as to effectuate the parties' intent." *Ministers*, 26 N.Y.3d at 470. This general rule applies even to issues of contract validity and the parties' ability to execute the agreement containing the choice-of-law clause. *See IRB-Brasil*, 20 N.Y.3d at 313, 316 (applying New York substantive law to evaluate the argument that the purported contract was void under foreign law because the board of directors never authorized it in accordance with foreign law).

We have discerned at least one possible exception to this general rule that may potentially apply in this case. The New York Court of Appeals has recognized

a public policy exception. *See Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006) (citing Restatement (Second) of Conflict of Laws § 187(2)). The Restatement describes this exception as follows:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless . . . application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts of Laws § 187(2)(b). Accordingly, in *Welsbach*, the New York Court of Appeals considered whether to honor the parties' Florida choice-of-law election with respect to a contractual "pay-if-paid" provision. Such provisions are unenforceable under New York law but permitted in Florida. The court's analysis hinged on whether New York's public policy disallowing such agreements was so fundamental, and Florida's policy allowing them so "truly obnoxious[,]" as to warrant invocation of the exception. 7 N.Y.3d at 629–30. The court answered both questions in the negative and did not apply the exception. *Id.* at 632. By contrast, in *Brown & Brown, Inc. v. Johnson*, the New York Court of Appeals relied on the public policy exception in declining to honor the parties'

contractual choice of Florida law with respect to a restrictive covenant in an employment agreement.  25 N.Y.3d 364, 368–70 (2015).

New York intermediate appellate courts have applied these same principles in considering whether to enforce contractual elections of *New York* law.  *See, e.g., Marine Midland Bank, N.A. v. United Missouri Bank, N.A.*, 223 A.D.2d 119, 124 (1st Dep't 1996) (concluding that Kansas public policy considerations were not sufficiently fundamental to override parties' choice to apply New York law).  The public-policy exception to the general enforceability of choice-of-law clauses may undergird the intermediate court's recent decision in *North American Elite Insurance v. Space Needle, LLC*, 200 A.D.3d 425 (1st Dep't 2021) (concluding that insurer licensed in Washington State that was seeking to enforce contractual New York choice-of-law provision in insurance contract issued in Washington State did not demonstrate a likelihood of success on the merits where provision choosing New York law violated Washington State prohibition against such clauses).  *See also* Restatement (Second) of Conflict of Laws § 202 (providing that the effect of illegality upon a contract is "determined by the law selected by application of the rules of §§ 187–188").

The Court of Appeals of New York has not decided whether, in light of *Ministers* and *IRB-Brasil*, New York recognizes this exception to the principle that

choice-of-law clauses are enforceable and require application only of the "substantive law" of the chosen jurisdiction. In the present case, there is a colorable argument that, to use the language of the Restatement (Second) of Conflict of Laws, Venezuela has the "materially greater interest" over the "particular issue" of PDVSA's authority or capacity to execute the Exchange Offer without National Assembly approval, and that enforcing the Governing Documents would violate a "fundamental policy" of Venezuela. For this reason, the public policy exception to the general enforceability of choice-of-law clauses may come into play in this case.

By identifying the above exception, we do not intend to rule out the possibility that other common law doctrines may be relevant. For example, in *Indosuez International Finance v. National Reserve Bank*, the New York Court of Appeals used a most-significant-relationship analysis to decide what law to apply in evaluating whether a set of agreements executed by the deputy chair of a Russian bank's board were unenforceable because the deputy lacked authority under Russian law to sign them. 98 N.Y.2d 238 (2002). The agreements included choice-of-law provisions selecting either New York or English law. After the bank failed to pay amounts due under the agreements, it argued that the agreements were not executed by the bank's accountant general, so they were null and void

under Russian law. Rather than simply applying the law the parties had elected in the agreement (New York or English) to evaluate the validity of the notes, the court conducted a most-significant-relationship analysis pursuant to sections 188 and 292(1) of the Restatement (Second) of Conflict of Laws and concluded that New York had the paramount interest. *Id*. at 245. The court accordingly applied New York law to determine the enforceability of the agreements. *Id*. at 245–46. Whether *IRB-Brasil* now precludes the approach taken in *Indosuez* is not entirely clear. The former case did not expressly overrule the latter.

Likewise, federal courts applying New York law have concluded that with respect to transactions with a foreign state or state instrumentality, questions regarding the actual authority of an agent of the state's government should be resolved with reference to the law of the foreign jurisdiction. *See, e.g.*, *Anglo-Iberia Underwriting Mgmt. Co. v. PT Jamsostek*, No. 97 Civ. 5116, 1998 WL 289711, at *3 (S.D.N.Y. June 4, 1998) (applying Indonesian law to assess an Indonesian government-owned entity's authority to conduct certain commercial activity), *vacated in part on other grounds by Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 F. App'x 776 (2d Cir. 2007); *Storr v. Nat'l Defence Sec. Council of Republic of Indonesia–Jakarta*, No. 95 Civ. 9663, 1997 WL 633405, at *2 (S.D.N.Y. Oct. 14, 1997) (same). In at least one case, the court followed this approach even in the presence

of a contractual choice-of-law election.  *See Themis Cap., LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012) (applying the law of the Democratic Republic of Congo to determine whether the signatories had actual authority to bind the DRC contractually).   In *Themis*, the court explained, "[w]here a commercial transaction is with a foreign state and that state is found to have the most significant relationship to the transaction, New York law must look to the law of the foreign state to determine the actual authority of an agent of the state's government."  *Id.* at 521 (internal quotation and alterations omitted) (citing Restatement (Second) of Conflict of Laws section 292(1) for the proposition that "choice of law questions related to actual authority are subject to 'most significant relationship' test").

Insofar as PDVSA is wholly owned by a foreign sovereign and the parties dispute its legal ability to execute the Exchange Offer, these decisions may have some bearing.  However, whether these federal district court decisions applying foreign law to determine the actual authority of a foreign state's representatives or state instrumentalities to enter into disputed agreements are well grounded in New York law has never been determined by any New York court.  Moreover, even assuming these cases are properly reasoned under New York law, it is not clear that cases dealing with actual authority in the principal-agent context are

applicable by analogy to cases, like the one before us, involving an entity's authority or capacity under applicable local law to enter, on its own behalf, into a particular agreement.

## VIII.  Certification

Rather than predict how the New York Court of Appeals would resolve these issues and risk doing violence to New York law, we recognize that the Court of Appeals is far better equipped to provide answers.  The Court of Appeals authorizes certification from us on determinative questions of New York law where there is no controlling Court of Appeals precedent.  N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27.  Likewise, under our Local Rule 27.2, we may certify questions of New York law to the New York Court of Appeals.

We have discretion about when to certify.  Among the factors that guide our decision are: (1) whether the New York Court of Appeals has addressed the issue; (2) whether the questions are "of importance to the state and may require value judgments and public policy choices;" and (3) whether the certified questions are "determinative of a claim before us."  *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 109 (2d Cir. 2012).  Furthermore, because certification commonly imposes considerable burdens of expense and delay on the parties, we must consider whether the benefits of certification outweigh the disadvantages.  *See 10012*

*Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 224 (2d Cir. 2021) ("[C]ertification is not costless: Because the certification process always incurs the risk of some delay, we must consider the age and urgency of the litigation, the impact that costs and delays associated with certification will have on the litigants, and the costs that delay imposes on other cases that depend on resolution of the legal issues." (internal citations and quotation marks removed)).

As set forth in depth above, this case raises a number of difficult legal questions that have not been addressed by the New York Court of Appeals.

These choice-of-law issues strike us as of utmost importance to the State of New York given its standing as the world's preeminent commercial and financial center. The Court of Appeals has noted New York's interest in promoting and preserving this status, and in maintaining predictability for parties. The unresolved questions certified below require balancing of potentially divergent policy interests with an eye to the consistency of New York contract law overall.

Furthermore, answers to our certified questions "could resolve this case." *Ministers & Missionaries Benefit Bd. v. Snow*, 780 F.3d 150, 155 (2d Cir. 2015), *certified question accepted*, 25 N.Y.3d 935 (2015); *see also Morris v. Schroder Cap. Mgmt. Int'l*, 445 F.3d 525, 531 (2d Cir. 2006) (resolution of certified questions "determine[d] the outcome of [the] appeal"), *certified question accepted*, 6 N.Y.3d 880 (2006).

If the court concludes New York choice-of-law principles require the application of New York law on the issue of the validity of the 2020 Notes, and that Article 150 and the resolutions have no effect on the validity of the contract under New York law, then we would affirm the district court's decision to apply New York law and uphold the validity of the bonds. On the other hand, if the court concludes Venezuelan law applies to the particular issue of PDVSA's legal authority to execute the Exchange Offer, then we would likely remand for an assessment of Venezuelan law on that question and, if necessary, for consideration of the Creditors' equitable and warranty claims.

In view of the very high value of 50.1% of the stock of Citgo, the collateral at issue in this litigation, we do not think that the additional burdens of another round of litigation would outweigh the public and private benefit of a definitive answer from the Court of Appeals regarding these thorny questions of New York law. The expense added by certification is modest relative to the amount in controversy. *Cf. Valls*, 919 F.3d at 742-43 ("In cases involving modest amounts at stake, the expense added by certification can exceed the amount in contention, and, depending on the circumstances, the attendant delays may also be unjustifiably burdensome."). And the added litigation time is warranted in light of the considerable stakes.

## CONCLUSION

For the reasons discussed above, we defer decision in this appeal, and CERTIFY the following questions to the New York Court of Appeals:

1. Given PDVSA's argument that the Governing Documents are invalid and unenforceable for lack of approval by the National Assembly, does New York Uniform Commercial Code section 8-110(a)(1) require that the validity of the Governing Documents be determined under the Law of Venezuela, "the local law of the issuer's jurisdiction"?

2. Does any principle of New York common law require that a New York court apply Venezuelan substantive law rather than New York substantive law in determining the validity of the Governing Documents?

3. Are the Governing Documents valid under New York law, notwithstanding the PDV Entities' arguments regarding Venezuelan law?

"Consistent with our usual practice, we do not intend to limit the scope of the Court of Appeals' analysis through the formulation of our question[s], and we invite the Court of Appeals to expand upon or alter these questions as it should

deem appropriate." *Nguyen v. Holder*, 743 F.3d 311, 317 (2d Cir. 2014) (internal quotation marks omitted).  This panel retains its jurisdiction.

It is therefore ORDERED that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of briefs and appendices, and the record filed in this Court by the parties.

## CERTIFICATE

The foregoing is hereby certified to the Court of Appeals of the State of New York pursuant to Second Circuit Local Rule 27.2 and New York Codes, Rules, and Regulations Title 22, section 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit.